CASE NO. 13-1403

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

A.H., et al.                                )
     Plaintiffs-Appellants,          )
                             )
vs.                                          )
                             )
EVENFLO COMPANY                              )
     Defendant-Appellee               )

_____

On Appeal from the United States District Court
For The District of Colorado
The Honorable R. Brooke Jackson
Civil Action No. 10-cv-02435-RBJ-KMT

_____

### APPELLANTS' OPENING BRIEF

Respectfully submitted,

R. Douglas Gentile
DOUTHIT FRETS ROUSE GENTILE
  & RHODES, L.L.C.
5250 West 116th Place, Suite 400
Leawood, Kansas 66211
(913) 387-1600
(913) 928-6739 – facsimile
dgentile@dfrglaw.com

Oral Argument Requested

SCANNED PDF FORMAT ATTACHMENTS ARE INCLUDED

December 30, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................v

PRIOR OR RELATED APPEALS ............................................ix

GLOSSARY ............................................................................x

I.    STATEMENT OF JURISDICTION .............................1

II.   STATEMENT OF THE ISSUES ...................................2

III.  STATEMENT OF THE CASE ......................................2

IV.   STATEMENT OF THE FACTS ................................... 3

    A.   The Evenflo Discovery 316 .................................. 3

    B.   Appellants' Purchase of the Discovery ................ 7

    C.   The Accident ....................................................9

    D.   The Lawsuit and Trial .....................................11

V.    SUMMARY OF THE ARGUMENTS ........................17

VI.   THE ARGUMENTS ....................................................19

    1.   THE DISTRICT COURT COMMITTED REVERSIBLE
         ERROR IN ENTERING JUDGMENT AS A MATTER OF LAW,
         AT THE CLOSE OF APPELLANTS' CASE, ON
         APPELLANTS' FAILURE TO WARN CLAIM ...........................19

         A.   Standard of Review ................................19

         B.   The Elements of Failure to Warn in Colorado .........................20

         C.   Appellants Presented Sufficient Evidence of Their Failure to
              Warn to Claim Against Appellee ...............................23

D.    Appellee's Knowledge of the Danger and the Duty to Warn...23

E.    Appellee's Failure to Warn Created a Jury Question On Whether The Discovery Seat Was Defective and Unreasonably Dangerous ..................................................................................29

F.    A.H.'s Injury Resulted From Appellee's Failure to Warn .......30

G.    The Court Failed to Recognize That A Manufacturer Can Be Liable For Failing To Warn Of Dangers Present In A Product's Proper Use...................................................................................33

H.    The District Court Committed Reversible Error By Taking Appellants' Failure To Warn Claim From The Jury ................34

I.    Conclusion ...............................................................................35

**2.    THE DISTRICT COURT ERRED WHEN IT (I) ADMITTED THE DEPOSITION OF A WITNESS WHEN "UNAVAILABILITY" HAD NOT BEEN DETERMINED UNDER FED. R. CIV. P. 32(A)(4)(B), AND (II) RELIED ON AN IMPROPER INTERPRETATION OF THIS RULE TO FIND, IN ITS ORDER DENYING APPELLANTS' MOTION FOR NEW TRIAL, THAT ITS ADMISSION OF THE DEPOSITION TESTIMONY AT TRIAL WAS NEITHER ERRONEOUS NOR UNFAIRLY PREJUDICIAL TO APPELLANTS ..........................36**

A.    Standard of Review..................................................................36

B.    Randy Kiser Was A Critical, Pivotal Witness ..........................37

C.    The District Court Erred In Allowing The Kiser Deposition To Be Played At Trial....................................................................39

The District Court Erred In Admitting Kiser's Deposition ......40

The Court Erred In Upholding Its Admission Of Kiser's Deposition In Its Ruling On Appellants' Motion For New Trial ...................................................................................45

D.    The Court's Error Was Prejudicial ...........................................48

The Historical Preference For Live Testimony ........................48

The Historical Condemnation Of Surprise Tactics...................50

Prejudice....................................................................................50

E.    Conclusion  ................................................................................53

**VII.   STATEMENT OF COUNSEL AS TO ORAL ARGUMENT.................54**

**VIII.  CONCLUSION** ................................................................................**54**

**CERTIFICATE OF COMPLIANCE** ....................................................**56**

**CERTIFICATE OF DIGITAL SUBMISSION**......................................**57**

**CERTIFICATE OF SERVICE** ............................................................**58**

ATTACHMENTS:

*A.H., et al. v. Evenflo Company,* 1:10-cv-02435-RBJ-KMT,
 Judgment ..........................................................................................1


*A.H., et al. v. Evenflo Company,* 1:10-cv-02435-RBJ-KMT,
 Order Denying Motion for New Trial ...........................................2


*A.H., et al. v. Evenflo Company,* 1:10-cv-02435-RBJ-KMT,
 Courtroom Minutes granting Directed Verdict ..............................3


*A.H., et al. v. Evenflo Company,* 1:10-cv-02435-RBJ-KMT,
 Trial to Jury Transcript, Day 6, App. v. 5 at 1481-92 and 1554 ....................4

# TABLE OF AUTHORITIES

*Cases*

*Alfonso v. Lund*,
783 F.2d 958 (10th Cir. 1986) ...................................................................40

*Anderson v. Heron Eng'g Co.,*
604 P.2d 674 (Colo. 1979)...........................................................21, 24, 35

*Angelo v. Armstrong World Indus.*,
11 F.3d 957 (10th Cir. 1993) ....................................................39, 48, 53

*Bailey v. Montgomery Ward & Co.,*
690 P.2d 1280 (Colo. App. 1984)...........................................................35

*Bartholic v. Scripto-Tokai Corp.*,
140 F. Supp. 2d 1098 (D. Colo. 2000)...............................................31, 32

*Beene v. Ford Motor Co.*,
513 F. App'x 755 (10th Cir. 2013) ....................................................34, 35

*Burton v. R.J. Reynolds Tobacco Co.*,
397 F.3d 906 (10th Cir. 2005) .........................................................19, 20

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
532 F.3d 1111 (10th Cir. 2008) .............................................................35

*Downing v. Overhead Door Corp.*,
707 P.2d 1027 (Colo. App. 1985).......................................23, 24, 30, 35

*Fairfield 274-278 Clarendon Trust v. Dwek*,
970 F.2d 990 (1st Cir. 1992)..................................................................43

*Fibreboard Corp. v. Fenton*,
845 P.2d 1168 (Colo. 1993) (en banc).......................................21, 22, 24

*Garcia-Martinez v. City and County of Denver*,
392 F.3d 1187 (10th Cir. 2004) .............................................36, 40, 48

*Grasmick v. Otis Elevator Co.*,
817 F.2d 88 (10th Cir. 1987) ...................................................................21

*Hidalgo v. Fagen, Inc.*
206 F.3d 1013 (10th Cir. 2000) ...............................................................33

*Huffman v. Caterpillar Tractor Co.*,
908 F.2d 1470 (10th Cir. 1990) ...............................................................22

*In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on November 15, 1987*, 720 F. Supp. 1493 (D. Colo. 1989)..............................................39, 44, 49

*J.I. Case Credit Corp. v. Crites*,
851 F.2d 309 (10th Cir. 1988) .................................................................20

*Jauch v. Corley*,
830 F.2d 47 (5th Cir. 1987) .........................................................48, 49, 54

*Marino v. Otis Eng'g Corp.*,
839 F.2d 1404 (10th Cir. 1988) ...............................................................50

*Martinez v. Atlas Bolt & Screw Co.*,
636 P.2d 1287 (Colo. App. 1981)......................................................32, 36

*Mile Hi Concrete, Inc. v. Matz*,
842 P.2d 198 (Colo. 1992) (en banc)........................................................34

*Oja v. Howmedica, Inc.*,
111 F.3d 782 (10th Cir. 1997) .................................................................21

*Palmer v. A.H. Robins Co.*,
684 P.2d 187 (Colo. 1984) (en banc)........................................................24

*Polys v. Trans-Colorado Airlines, Inc.*,
941 F.2d 1404 (10th Cir. 1991) .........................................................40, 50

*Q.E.R., Inc. v. Hickerson*,
880 F.2d 1178 (10th Cir. 1989) ...............................................................20

*S.E.C. v. Peters*,
978 F.2d 1162 (10th Cir. 1992) ................................................................37

*Salsman v. Witt*,
466 F.2d 76 (10th Cir. 1972) ...........................................................49, 54

*Staley v. Bridgestone/Firestone, Inc.*,
106 F.3d 1504 (10th Cir. 1997) .......................................................31, 32

*Stoczynski v. Livermore, D.C.*,
782 P.2d 834 (Colo. App. 1989) ......................................................44, 45

*Trust Dep't of First Nat'l Bank of Santa Fe, Colo. Branch v. Burton Corp.*,
11-CV-01629-REB-CBS, 2013 WL 4884483 (D. Colo., Sept. 11, 2013) ..............21

*Union Supply Co. v. Pust*,
583 P.2d 276, 283 (Colo. 1978) (en banc) .......................................22, 34

*United States v. Medina-Estrada*,
81 F.3d 981 (10th Cir. 1996) ................................................................36

*United States v. Smith*,
888 F.2d 720 (10th Cir. 1989) ..............................................................37

*Vista Resorts, Inc. v. Goodyear Tire & Rubber Co.*,
117 P.3d 60 (Colo. App. 2004) ..................................................21, 22, 35

### Statutes

18 U.S.C. § 1332(a)(1) ........................................................................1

28 U.S.C. §1291 ................................................................................1

### Rules

C.R.C.P. 32(a)(3)(B) ..........................................................................45

Fed. R. App. P. 4(a)(1)(A) ...................................................................1

Fed. R. App. P. 4(a)(4) ........................................................................1

Fed. R. Civ. P. 32 ................................................................48, 49

Fed. R. Civ. P. 32(a).................................................................39

Fed. R. Civ. P. 32(a)(4)............................................ 12, 37, 39, 40, 43, 47

Fed. R. Civ. P. 32(a)(4)(A)-(E)........................................................39, 40

Fed. R. Civ. P. 32(a)(4)(B) ............................. 2, 3, 18, 40, 43, 44, 45, 46, 48, 53, 54

Fed. R. Civ. P. 50(a)(1).......................................................19, 34

Fed. R. Civ. P. 59(b) ...............................................................1

## *Other*

CJI-Civ. 4th 14:19 (4th ed.) .......................................................23

RESTATEMENT (SECOND) OF TORTS § 402A...............................................33

RESTATEMENT (SECOND) OF TORTS § 402A cmt. j...........................................33

## PRIOR OR RELATED APPEALS

None.

## GLOSSARY

CCPA ................................................................Colorado Consumer Protection Act

NHTSA ........................................ National Highway Traffic Safety Administration

# I.     STATEMENT OF JURISDICTION

The United States District for the District of Colorado ("the District Court") had jurisdiction over this matter pursuant to 18 U.S.C. § 1332(a)(1) because Appellants and Appellee Evenflo Company Inc. (also referred to herein as "Evenflo") are citizens of different States and the amount in controversy exceeds the sum of $75,000.  At the conclusion of trial, the jury rendered a verdict for Appellee on all counts submitted to it.

The District Court entered its judgment for Appellee on November 27, 2012.  Aplt. App. v. 1 at 149-50 (*Attachment 1*).  Pursuant to Fed. R. Civ. P. 59(b), Appellants filed a timely motion for new trial on December 21, 2012 raising both of the issues addressed in this appeal.  Aplt. App. v. 1 at 151-76.  On August 30, 2013, the District entered its Order denying Appellants' Motion for New Trial.  Aplt. App. at v. 1 at 233-53 (*Attachment 2*).  Pursuant to Fed. R. App. P. 4(a)(1)(A) and (a)(4).  Appellants then filed a timely notice of appeal on September 27, 2013.  *See* Aplt. App. v. 11 at 3286-87.  This Court's jurisdiction derives from 28 U.S.C. §1291.

## II.    STATEMENT OF THE ISSUES

1) THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ENTERING JUDGMENT AS A MATTER OF LAW, AT THE CLOSE OF APPELLANTS' CASE, ON APPELLANTS' FAILURE TO WARN CLAIM.

2) THE DISTRICT COURT ERRED WHEN IT (I) ADMITTED THE DEPOSITION OF A WITNESS WHEN "UNAVAILABILITY" HAD NOT BEEN DETERMINED UNDER FED. R. CIV. P. 32(A)(4)(B), AND (II) RELIED ON AN IMPROPER INTERPRETATION OF THIS RULE TO FIND, IN ITS ORDER DENYING APPELLANTS' MOTION FOR NEW TRIAL, THAT ITS ADMISSION OF THE DEPOSITION TESTIMONY AT TRIAL WAS NEITHER ERRONEOUS NOR UNFAIRLY PREJUDICIAL TO APPELLANTS.

## III.    STATEMENT OF THE CASE

This is a product liability case in which Appellants sought recovery from Appellee after an Evenflo child safety seat unlatched and came apart in a routine automobile accident.  When the latch on his infant seat failed, Appellant A.H. lost the protection provided by his restraint system and was violently thrown into the luggage/storage area in Appellants' Jeep.  As a result, A.H. sustained a skull fracture and suffered a severe traumatic brain injury that left him permanently

impaired and facing a lifetime of medical needs.  No one else in the vehicle was hurt; the Jeep's other two occupants, A.H.'s older brother and his mother, both walked away from the accident.

Appellants sought to submit claims of defective design, failure to warn, and violations of the Colorado Consumer Protection Act ("CCPA") to the jury. However, the court directed a verdict for Appellee on the failure to warn claim and only submitted the design defect and CCPA claims to the jury.  In addition, the court allowed Appellee to present the videotaped deposition of a pivotal witness for Appellee, Randolph Kiser, under Fed. R. Civ. P. 32(a)(4)(B) without even knowing if he was "unavailable" or not.  The court then affirmed its trial ruling, in denying Appellants' Motion for New Trial, despite finding as "fact" that Kiser's absence from trial had been procured by Appellee and that counsel for Appellee had misrepresented the witness's availability to testify "live."  At the conclusion of the case, the jury returned a verdict for Appellee.

## IV.    STATEMENT OF THE FACTS

### A.  The Evenflo Discovery 316

A.H.'s infant safety seat (a "Discovery 316") was manufactured on January 5, 2005.  Its purpose, like a seat belt for an adult, is to provide safety restraint for infants being transported in vehicles and to protect them from injury in the event of an automobile accident.  Aplt. App. v. 2 at 510-11 and 575.  The Discovery is an

"infant only" seat – it faces the rear of the vehicle and is comprised of two major components; a "seat" and a "convenience base."  Aplt. App. v. 8 at 2341-55.  The two components are secured to one another through a latching mechanism.  When latched together, the seat/base unit looks like this:



According to Appellee, the Discovery 316 can be used with, or without, the "base;" as Appellee states in the Evenflo Discovery Owner's Manual ("the Manual"), the "base" is for "convenience" only.  Aplt. App. v. 5 at 1442-43; Aplt. App. v. 8 at 2351-53.  If a caregiver chooses *not* to use the base, the child is secured into the "seat" using its integral safety harnesses; the vehicle seat belts are then routed through the "seat" to secure it in the vehicle.  Aplt. App. v. 8 at 2153.

To install the Discovery *with* the "base," the base, by itself, is placed on the vehicle's seat.  The vehicle seatbelt is routed through the "base" and buckled; the "base" is now ready for use.  When it is time for a drive, the infant is secured into

the "seat" with the integrated harness; the "seat" is then snapped into the already installed "base."  Upon arrival at the caregiver's destination, the caregiver simply pulls a "latch" on the "seat" and the "seat" pops out of the "base," after which the "seat," with the infant inside, is easily removed from the car.  Aplt. App. v. 8 at 2350.

If the latch mechanism that holds the seat and base together fails during a crash, the seat, with the baby strapped inside it, is immediately unrestrained from the vehicle and can tumble around inside a vehicle; the seat and baby can even be ejected from the vehicle.  Aplt. App. v. 2 at 496, 510, 519, and 522.  This is, plainly, a very substantial hazard to the infant occupying the seat and is equivalent to an adult occupant's seat belt simply coming unbuckled when it is needed the most – in an accident.  Aplt. App. v. 2 at 496-97, 522, 575; Aplt. App. v. 6 at 1828-30.

Appellee knew, before production even began, that the Discovery was prone to these kinds of latch failures when the "convenience base" was in use.  In this regard, the evidence admitted at trial established that the first latch failures occurred in 1997 before the seat even went into production.  Aplt. App. v. 8 at 2360; Aplt. App. v. 11 at 3246.  Despite these failures, production began in January, 2008 and, in a quality assurance  "drop test" of a Discovery done in July,

1999, the latch failed – even though the height of the drop was a mere three feet. Aplt. App. at v. 7 at 2360; Aplt. App. v. 11 at 3246; Aplt. App. v. 2 at 566-67.

Since at least one seat/base separation occurred by simply dropping the Discovery from a few feet, it was not surprising that evidence of "real world" complaints of failures began pouring into Appellee's offices soon after the seats hit the market.  As seen in Trial Exhibit 107 (a summary of the incidents) and Trial Exhibit 45 (a compilation of supporting documents), Appellee began seeing latch failures and seat/base separations in car accidents within just seven months of the commencement of production.  Aplt. App. v. 9 at 2363; Aplt. App. v. 10 at 2724-3083; Aplt. App. v. 11 at 3246-60.  These exhibits established that, from the date of the first reported incident through the accident involving A.H., Appellee was advised by consumers of no less than 74 Discovery latch failures, ten of which occurred in situations where there was not even an impact to the vehicle.  Aplt. App. v. 2 at 611-12.  Of the 64 latch failures that occurred in impact-related events, 10 resulted in child fatalities and 14 resulted in non-fatal head injuries.  Aplt. App. v. 2 at 612.

These numbers do not tell the entire story.  The evidence at trial established that, in the years leading up to A.H.'s accident, Appellee had been notified of only 500 accidents involving the Discovery where no latch failure occurred, making the total universe of accident data 564 impact-related events.  Aplt. App. v. 2 at 614-

15.  Statistically, then, the latch on the Discovery was failing in roughly one out of ten accidents – a more than 11% failure rate.  In those accidents, at least _one in three_ resulted in either a non-fatal head injury to an infant or a child fatality.

Latch failures on the Discovery were, as the evidence established, a very serious and common hazard arising from the use of the "convenience" base with the Discovery and one that was well known to Appellee.  In fact, after the accident at issue in this case, certain models of the Discovery were recalled by Appellee because of the seat/base separation hazard and the risk of separation in side impact crashes.   Aplt. App. v. 3 at 703-04 and 832-33; Aplt. App. v. 6 at 1831-34.  Appellants' seat was not part of the recall, even though the latch mechanism was identical to that in the recalled seats.  Aplt. App. v. 2 at 560.

## B.  Appellants' Purchase of the Discovery

Prior to the birth of A.H., Appellant Tony Hadjih and his wife Razika went to Walmart to shop for a new child safety seat.   Aplt. App. v. 5 at 1378. After spending considerable time looking at the features of a number of infant seats, they decided to purchase the Discovery 316.  Aplt. App. v. 5 at 1379.  They took the seat home and read the Manual.  Aplt. App. v. 5 at 1380-81 and 1458.

The Manual contained instructions for installation and use of the seat, and these instructions were read, understood and followed by the Hadjihs.  Aplt. App. v. 5 at 1385-86 and 1471.   In this regard, it was undisputed at trial that the

"convenience base" was installed in the Hadjihs' Jeep in accordance with the Manual's instructions.  Aplt. App. v. 2 at 575-76.  It was also undisputed that the seat was installed into the base in accordance with the Manual.  Aplt. App. v. 2 at 575-76.  And it was undisputed that, at the time of the accident, A.H. was secured in his seat in accordance with the Manual.  Aplt. App. v. 2 at 575-76.

In addition to instructions for use, the Manual also contained warnings on a variety of dangers.  Aplt. App. v. 8 at 2342-44.  Some of the dangers warned against were remote (e.g. the "danger" of allowing a child to have a lollipop while riding in the seat) while others were obvious (e.g. the danger of placing the seat on the edge of a kitchen counter with a child secured inside).  Aplt. App. v. 8 at 2344.  What was absent was any mention of the substantial hazard of latch failure and seat/base separation, known to Appellee, which was associated with the use of the "convenience base."  Aplt. App. v. 8 at 2341-2355.

Had such a warning been given, Appellant Tony Hadjih testified he would not have allowed the seat to be used by A.H. with the base.  Aplt. App. v. 5 at 1471.  Mrs. Hadjih's testimony was much the same.  Aplt. App. v. 5 at 1384-85.  Appellants' evidence also established with expert testimony that the hazard of seat/base separation *did not exist* if the seat was used without the "convenience" base.  Aplt. App. v. 2 at 584-85.[1]  Based on this evidence, Appellants claimed that

---

[1] Appellee's expert admitted this common sense fact.  Aplt. App. v. 6 at 1827-28.

Appellee's failure to warn of the danger of seat/base separation hidden in the latch of the Discovery 316 was the proximate cause of A.H.'s injuries.

## C.  The Accident

On June 10, 2005, then four-month-old A.H. was properly secured in his Discovery 316 (rear facing) in the rear passenger side seat of the Hadjih's Jeep Grand Cherokee as his mother, Razika, drove the vehicle home.  Aplt. App. v. 5 at 1374-77.  The base was properly secured by the Jeep's seatbelts.  Aplt. App. v. 2 at 546; Aplt. App. v. 3 at 842; Aplt. App. v. 5 at 1454.  A.H.'s brother Massi was in a forward facing child seat that had been installed in the Jeep's rear driver's side seating position.  Aplt. App. v. 5 at 1374-77.    Unfortunately, as the Jeep turned left on a green light at the intersection of Buckley and Orchard, it was struck in the rear passenger side door by another vehicle.  Aplt. App. v. 5 at 1385-87.  It was a common, typical intersection collision involving speeds in the 20 – 23 mph range. Aplt. App. v. 2 at 539, 542, and 544; Aplt. App. v. 3 at 702-03, 861, 864-65, and 869-70.

Immediately after the collision, Razika looked in the back seat to check on her baby – but all she saw was the still-attached base of the Discovery.  Aplt. App. v. 5 at 1387-88. The seat itself and A.H. were simply gone.  Neither Razika nor Massi were injured at all, (Aplt. App. v. 5 at 1388-89), so Razika immediately got out of the Jeep, ran around to the back, and found A.H. in the rear luggage

compartment, upside down but still tightly secured in the seat portion of his Discovery.  Aplt. App. v. 2 at 577; Aplt. App. v. 5 at 1388.    It was immediately apparent that A.H. was badly injured.  Aplt. App. v. 5 at 1388.

A.H. was taken by ambulance to the hospital.  Aplt. App. v. 5 at 1389-90. The right side of his skull (i.e. the side *opposite* the impact from the striking vehicle) had fractured; his brain was also bleeding and swelling on the right side.[2] Aplt. App. v. 3 at 880-81, 884, and 888-94.  These injuries – none of which would have existed had he not been ejected into the Jeep's cargo compartment (Aplt. App. v. 3 at 898 and 913) – caused permanent brain damage, seizures and frontal lobe syndrome.  Aplt. App. v. 3 at 898, 912-13, and 940-42. As a result, A.H. has permanent cognitive deficits and significant problems with his behaviors, anger, impulsivity, speech, and language.  Aplt. App. v. 3 at 875-76, 898-90, and 910; Aplt. App. v. 5 at 1405-08.   Because of these conditions, A.H. will require extensive medical treatment and rehabilitation for the rest of his life.  Aplt. App. v. 11 at 3262-85.

---

[2] A.H. also had a fracture on the left side of his head but Appellants' evidence was that this fracture healed without causing any "residual damage."  Aplt. App. v. 3 at 880-81.

D.  The Lawsuit and Trial

Appellants filed suit against Appellee seeking damages under several theories, including the failure to warn of the risks of injury when using the Discovery with its base.  Aplt. App. v. 1 at 26-45.  Appellants incorporated these allegations into their strict liability claim and specifically alleged in their negligence claim that Appellee "failed to timely provide adequate instructions, warnings and recommendations regarding, among other things, the limitations of the seat, the need for supplemental protection to retain the seat to base in side impacts, [and] the general risk of seat/base separation."  Aplt. App. v. 1 at 41-42.

At trial, and as is relevant to this appeal, Appellants introduced the facts outlined above into evidence.  At the conclusion of Appellants' evidence, Appellee moved for judgment as a matter of law on Appellants' failure-to-warn and CCPA claims.  Aplt. App. v. 4 at 1477-79. Appellants' counsel responded regarding the warnings claim that:

> [I]t's clear from the evidence of both Mr. Hadjih and Mrs. Hadjih testified that had they been given the warning that this seat was safe and would have provided additional restraint if used without the base, they would have complied with that warning.  Both plaintiffs testified that they read the manual, they complied with the warnings, they understood the warnings, they followed the warnings; and the Evenflo manual, despite 74 instances of seat/base separation prior to the date of the accident, despite ten dead children, despite numerous injuries, skull fractures, and other injuries, caused by seat base separation, no warning was given to the plaintiffs that that particular risk could be avoided if they simply used the seat without the base.

11

Aplt. App. v. 5 at 1480-81. Following this brief argument, the District Court granted Appellee's motion because of the Court's belief that this was "a design case" and "it didn't make sense" for Appellee to put a warning on the Discovery. Aplt. App. v. 5 at 1481 (*Attachment 4*); *see also* Aplt. App. v. 1 at 108-11 (*Attachment 3*).  At the same time, the District Court overruled Appellee's motion seeking a directed verdict on Appellants' CCPA claim because it expressly found that:

> there is evidence on which the jury could find that there was a deceptive trade practice by omitting a by then fairly well-established history of detachments in similar car seats, substantially similar car seats, substantially similar situation and accidents; and further that the number of those that had been reported themselves – and I would say before and after this particular incident – are sufficient to have the public impact go to the jury.  This has affected, apparently, a number of people, not just the Hadjihs.

Aplt. App. v. 5 at 1484 (*Attachment 4*); *see also* Aplt. App. v. 1 at 108-11(*Attachment 3*).

After the District Court's rulings on Appellee's motion for directed verdict, Appellee offered to play the videotaped deposition of Appellee's Rule 30(b)(6) representative and expert witness Randolph Kiser in lieu of his live testimony. Aplt. App. v. 5 at 1484-86; *see, e.g.*, Aplt. App. v. 1 at 187-89. (stating "Mr. Kiser **will testify** as a fact witness and may also provide testimony that would be considered expert testimony . . . . ").  Appellants objected, and the parties debated whether the deposition was admissible pursuant to Fed. R. Civ. P. 32(a)(4).  Aplt.

App. v. 5 at 1484-92 (*Attachment 4*).  The District Court was concerned about the sudden claim of "unavailability" and asked Appellee's counsel to confirm it. Aplt. App. v. 5 at 1485-92 (*Attachment 4*). Then, without waiting for the answer, the District Court simply ordered that the deposition be played for the jury.  Aplt. App. v. 5 at 1554 (*Attachment 4*).

Thereafter, Appellee played the videotape deposition of Mr. Kiser for the jury over a two-day period.  Aplt. App. v. 5 at 1554 and 1578.  He was the only Evenflo employee, past or present, whose testimony Appellee presented to the jury.  Appellee presented Kiser's deposition testimony about why it decided to voluntarily recall the Discovery 390/391 and the 2004 NHTSA investigation of the Discovery 316, which ended without a recall of the Discovery 316.  Aplt. App. v. 7 at 2204-11, 2215-46, 2257-64, 2268-75, 2292-94 and 2297;  *see also* Aplt. App. v. 7 at 2314.[3]  Appellee later capitalized on this testimony as part of its defense that it was a "responsible" company because, when it learned about the defect present in

---

[3] Portions of the videotaped depositions of Greg Allison, Randy Kiser, Connie Stover, and Stephanie K. Thompson were played during the course of trial but were not transcribed by the District Court's reporter.  As such, Appellants have included in their appendix a transcript of those depositions with the parts that were played highlighted yellow along with a copy of the video clips that were played.  *See* Greg Allison's Deposition, Aplt. App. v. 6 at 2059-99 and 2100; *see also* Randy Kiser's Deposition, Aplt. App. v. 7, 2101-313 and 2314; *see also* Connie Stover's Deposition, Aplt. App. v. 7 at 2315-29 and Aplt. App. v. 7 at 2330; *see also* Stephanie K. Thompson's Deposition, Aplt. App. v. 7 at 2331-39 and 2340.

the Discovery 390/391, it "voluntarily" made the decision to recall the seat.  Aplt. App. v. 6 at 2032-33.

The issue regarding the Kiser deposition was more fully developed after trial and resulted in certain findings of fact by the District Court that are important to this appeal.  In their Motion for New Trial, Appellants provided a lengthy factual history to the District Court regarding Kiser and the "unavailability" claim.  Aplt. App. v. 1 at 151-76.  After additional briefing, (Aplt. App. v. 1 at 196-216 and 217-32), the District Court found, as fact, that Appellee had consistently and repeatedly represented that Kiser would testify live at trial.  App. v. 1 at 236-37.  The District Court found that it was not until Friday, November 9th, the fifth day of trial, that Appellee advised Appellants that it "was considering presenting Mr. Kiser via his deposition testimony only" and that it was not until the next day (Saturday) that Appellee unequivocally confirmed that this was now the plan.  Aplt. App. v. 1 at 238.

On Tuesday, November 13, before the deposition was played and while considering Appellants' Rule 32 objection, the District Court asked Appellee's counsel point blank, demanding an "honest" and "candid" answer, if the decision not to call Mr. Kiser live was "tactical."  Aplt. App. v. 5 at 1485; Aplt. App. v. 1 at 239. Appellee's counsel responded that "it was not tactical, Your Honor.  I'm trying to get my case done by Thursday, so I can close by Friday.  [Mr. Kiser]

14

doesn't work for me."  Aplt. App. v. 5 at 1485; Aplt. App. v. 1 at 239.  But as the District Court later found, this was far from the truth.

As set forth in its "Further Findings of Fact," the District Court found that "Evenflo could have called [Kiser] as a live witness had it wished to" and that "the scenario as it played out from Mr. Kiser's departure to the conclusion of the trial was substantially driven by strategic and tactical considerations."  Aplt. App. v. 1 at 245-46.  The Court also determined that the plan to not produce Mr. Kiser at trial "did not occur overnight."  Aplt. App. v. 1 at 246.  It was, said the Court, "abundantly clear" that Appellee's decision on the issue was tactical and in direct contravention of its lead counsel's assertions to the contrary.  Aplt. App. v. 5 at 246-47.

The District Court concluded that the scenario surrounding the playing of Kiser's deposition "was orchestrated" by Appellee repeatedly not being "forthright about Mr. Kiser's change of employment" with Appellants and "in at least one respect" not being forthright with the Court.  Aplt. App. v. 1 at 250.  The Court further concluded that "[t]he continuum of [Appellee's] conduct maintained in the minds of [Appellants'] lawyers the anticipation that Mr. Kiser would testify at trial."  Aplt. App. v. 1 at 250.  Through this "gamesmanship," Appellee hid the truth from both Appellants and the Court "that it was at least considering the use of

[Mr. Kiser's] deposition instead of live testimony all along." Aplt. App. v. 1 at 250.

After using "gamesmanship" and an "orchestrated" plan to successfully preclude Appellants from any cross-examination of its expert, principal in-house engineer, and corporate representative on issues critical to the latch failures with the Discovery, and with the warnings claims out of the case, the jury rendered a verdict for the Appellee on both remaining claims. Aplt. App. v. 1 at 149-50. After the District Court entered judgment in accordance with the jury's verdict, Aplt. App. v. 1 at 149-50, Appellants filed a timely Motion for New Trial raising the issues set forth in this appeal. Aplt. App. v.1 at 151-76. After additional briefing, the court entered its Order denying Appellants' motion as to both of those issues. Aplt. App. v. 1 at 233-53.

## V.    SUMMARY OF THE ARGUMENTS

The District Court committed three errors that, individually or collectively, require reversal and a new trial.  First, the Court entered judgment as a matter of law on Appellants' failure to warn claim despite evidence that easily met the elements of Colorado substantive law.   Appellants presented evidence that Appellee knew that the latch mechanism on the Discovery was failing in one out of ten crashes and that, when the latch failed, a head injury or death to an infant was a highly likely outcome.

Appellants proved, indeed it was not disputed, that Appellee did nothing to warn Appellants about these risks.  Nor was it disputed that a warning, if given, would have altered the behavior of Appellant Tony Hadjih (as well as Razika) – neither would have used the "base" had they known of the very high risk of seat/base separation.

Finally, Appellants established that the seat/base separation caused A.H. to suffer a traumatic brain injury and that, had his seat remained in its position, his permanent traumatic brain injury would not have been sustained.  In sum, Appellants introduced sufficient evidence for a reasonable jury to find each element of Appellants' failure to warn claim and, thus, it was reversible error to take this issue from the jury.  Based on this error, this Court should reverse and remand this matter for a new trial on Appellants' failure to warn claim.

Second, the District Court committed reversible error by improperly admitting Mr. Kiser's videotaped deposition into evidence over Appellants' objection and then upholding that decision in its Order denying Appellants' Motion for New Trial.  In this regard, the Court initially erred in ordering the videotaped deposition to "start" before it was even known if Kiser was truly "unavailable."

The District Court also erred in its application of Fed. R. Civ. P. 32(a)(4)(B) to the facts as set forth in the Order denying the Motion for New Trial.  In the Order, the Court expressly found that Appellee could have produced Mr. Kiser live if it so chose but, instead and for purely tactical reasons, chose not to.  In other words, the Court found that Kiser's absence not only "appeared" to have been procured by Appellee but that it was, in fact, _actually_ procured by Appellee.

Furthermore, the District Court found that Appellee misrepresented Kiser's availability to testify in executing this tactic.  Based on these findings, the Court erroneously determined that the admission of Kiser's deposition was proper despite the fact that Appellee offered no valid explanation as to how Kiser's absence was not procured by it.  Furthermore, the Court erred in determining that, if it wrongfully admitted the deposition, this error was not prejudicial to Appellants. Because the Court committed reversible error in one or all of these respects, Appellants request that this Court reverse and remand this matter for a new trial on all issues.

# VI.   THE ARGUMENTS

## 1. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ENTERING JUDGMENT AS A MATTER OF LAW, AT THE CLOSE OF APPELLANTS' CASE, ON APPELLANTS' FAILURE TO WARN CLAIM.

The District Court improperly entered a directed verdict on Appellants' failure to warn claim because Appellants presented sufficient evidence of each and every element of a Colorado failure to warn claim for a reasonable jury to find in Appellants' favor.   More specifically, it failed to judge the sufficiency of Appellants' evidence as set forth in Fed. R. Civ. P. 50(a)(1), which allows a court to enter judgment as a matter of law on a particular issue _only_ if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."   Because the District Court failed to make such a finding, it committed reversible error by arbitrarily dismissing Appellants' failure to warn claim based on its conclusion that this was "a design case" and only "a design case."

### A. Standard of Review

The standard of review for the improper granting of a motion for directed verdict is *de novo*.  *See Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 914 (10th Cir. 2005).

> A motion for directed verdict is reviewed under the same standard as that applied in the district court.   The court may grant a directed verdict only if the evidence points but one way and is susceptible to

> no reasonable inferences which may support the opposing party's position. The evidence and inferences must be construed in a light most favorable to the nonmoving party.

*Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1180 (10th Cir. 1989) (internal quotations omitted).

After reviewing the evidence in this light, "a directed verdict is justified 'only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion.'" *J.I. Case Credit Corp. v. Crites*, 851 F.2d 309, 311 (10th Cir. 1988) (internal quotations omitted). "In other words, 'the trial judge may grant a motion for directed verdict only when all the inferences to be drawn from the evidence are so in favor of the moving party that reasonable persons could not differ in their conclusions.'" *Id.* Thus, the question this Court must answer is, when reviewed in the light most favorable to Appellants, could a reasonable jury have found that every element of a failure to warn claim was present? Appellants submit that the answer to this question is "yes."

## B. The Elements of Failure to Warn in Colorado

Because the District Court's entry of a directed verdict implicated the substantive law of the state of Colorado, this Court also must apply Colorado law. *See Burton*, 397 F.3d at 914 (applying Kansas substantive law in reviewing the denial of a motion for directed verdict as to plaintiff's failure to warn claim). While negligent failure to warn and strict liability failure to warn claims were

originally addressed as separate claims in Colorado, more recently this Court has recognized that there is no rigid distinction between the two claims despite their slightly different focus. *Compare Grasmick v. Otis Elevator Co.*, 817 F.2d 88, 90 (10th Cir. 1987), *with Oja v. Howmedica, Inc.*, 111 F.3d 782, 791 (10th Cir. 1997).

The focus of a negligent failure to warn claim is whether a manufacturer's actions in not warning the users of its product "fell below an acceptable standard of care" while the focus of a strict liability claim is "whether the defendant failed to warn of particular risks that were known or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of . . . distribution." *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1174-75 (Colo. 1993) (en banc). Nevertheless, both types of claims require essentially the same showing that: (1) the product was defective at the time of sale due to the lack of a warning, (2) causation, and (3) damages. *See Oja*, 111 F.3d at 791.

What is *not* required is that plaintiff proves that the product is "defective as to its design or manufacture." *Trust Dep't of First Nat'l Bank of Santa Fe, Colo. Branch v. Burton Corp.*, 11-CV-01629-REB-CBS, 2013 WL 4884483 at *4 (D. Colo., Sept. 11, 2013). Instead, "a product which is free of manufacturing and design defects nonetheless may be defective and unreasonably dangerous if not accompanied by adequate instructions and warnings." *Anderson v. Heron Eng'g Co.,* 604 P.2d 674, 676 (Colo. 1979); *see also Vista Resorts, Inc. v. Goodyear Tire*

21

*& Rubber Co.*, 117 P.3d 60, 71 (Colo. App. 2004). Such a product is defective and

"'unreasonably dangerous' to the user or consumer if the manufacturer does not

give sufficient warnings of dangers inherent in the product or in its intended use in

order to make it safe." *Union Supply Co. v. Pust,* 583 P.2d 276, 283 (Colo. 1978)

(en banc). Therefore, if a particular risk associated with a product is "known or

knowable in light of the generally recognized and prevailing scientific and

technical knowledge available at the time of manufacture and distribution" then the

product is defective and unreasonably dangerous unless a sufficient warning

regarding this risk is given. *Fibreboard Corp.*, 845 P.2d at 1175.

Looking at this issue from a different perspective, a manufacturer gives

sufficient warnings regarding a product if it "adequately inform[s] the ordinary

user of *any specific risk of harm* which may be involved in any intended or

reasonabl[y] expected use . . . ." *Huffman v. Caterpillar Tractor Co.*, 908 F.2d

1470, 1479-80 (10th Cir. 1990)(emphasis in original). And if a manufacturer fails

to give sufficient warnings, its failure to "warn of the potentially dangerous

propensities of its product render[s] that product unreasonably dangerous." *Union

Supply Co.,* 583 P.2d at 283. Or, as the Colorado jury instruction on negligent

failure to warn explains:

> If a [manufacturer] of [a product] knows or in the exercise of
> reasonable care should know that (1) the use of the [product] may be
> harmful or injurious to a [user], and (2) that risk of harm or injury is
> not obvious to a reasonable [user], then the [manufacturer] must use

reasonable care to warn the [user] of the risk of harm or injury if a reasonably careful person would under the same or similar circumstances. The failure to do so is negligence.

CJI-Civ. 4th 14:19 (4th ed.).[4]

C. Appellants Presented Sufficient Evidence
of their Failure to Warn to Claim Against Appellee

Appellants clearly presented sufficient evidence of every element of a Colorado failure to warn claim and, thus, this claim should have been submitted to the jury for determination. *See Downing v. Overhead Door Corp.*, 707 P.2d 1027, 1034 (Colo. App. 1985) ("Since a factual basis existed for submitting the case to the jury under a failure to warn theory, the trial court's refusal to do so was error."). More specifically, Appellants showed that: (1) Appellee knew about the danger of the Discovery 316 seat separating from its base in impacts and knew the serious risks that such a failure presented to an infant; (2) Appellee failed to provide a warning about this risk, which rendered the Discovery 316 defective and unreasonably dangerous; and (3) it was ultimately this failure that caused A.H.'s injuries on June 10, 2005.

D. Appellee's Knowledge of the Danger and the Duty to Warn

"Where a manufacturer . . . of a product is, or should have been, aware that a product is unreasonably dangerous absent a warning, and such warning is

---

[4] Appellants tendered a similar instruction to the District Court in this case. Aplt. App. v. 1 at 254.

feasible," that manufacturer is liable in tort "if an appropriate and conspicuous warning is not given." *Id.* at 1033. As such, "[w]hen a manufacturer . . . knows or should know of unreasonable dangers associated with the use of its product not obvious to product users, it has a duty to warn of these dangers . . . ." *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 198 (Colo. 1984) (en banc).

To prove duty to warn against a manufacturer under Colorado law, a party can show either that the manufacturer actually knew of the danger or that the danger was "knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and distribution." *See Fibreboard Corp.*, 845 P.2d at 1172. In such situations, the failure to warn can "impose on the manufacturer the same liability it would incur for a manufacturing or design defect." *Anderson*, 604 P.2d at 676.

When the evidence in this case is examined in the light most favorable to the Appellants, there is more than sufficient evidence showing that Appellee knew of the inherent danger present in the Discovery 316 – the danger that resulted from its propensity to suffer seat/base separations. Appellants introduced evidence of test failures revealing at least one seat/base separation that occurred when a Discovery was simply dropped on the floor from a height of three feet. Appellants also introduced evidence of separations that occurred in sled testing. Aplt. App. v. 8 at 2356-59 and 2360; Aplt. App. v. 11 at 3246-60.

Most significant to the warnings issues was the evidence of other latch failures involving seat/base separations that had been reported to Appellee by consumers just like Appellants. As seen briefly above, these reports, set forth in detail in Trial Exhibit 45 and summarized in Trial Exhibit 107, included no less than 74 separate incidents of Discovery seat/base separations that Appellee had actual knowledge about from the reports of its own customers, including separations that resulted in ten deaths and fourteen head injuries to infants. Aplt. App. v. 2 at 611-12; Aplt. App. v. 9 at 2363-723; Aplt. App. v. 10 at 2724-3083; Aplt. App. v. 11 at 3246-60. Some of the more pertinent comments directed to Appellee, several of which involved lawsuits filed well prior to the date of A.H.'s seat failure, included the following:

- "Carrier came out of base. Carrier and restrained child ejected from vehicle." The two month old child was killed. Aplt. App. v. 9 at 2454-55; Aplt. App. v. 11 at 3249

- "On impact with the tree, my son was ejected from the base of your product. He hit his head on the console of the car and had to be taken to the hospital with head injuries. . . . We used your car seat with confidence that it would protect our son, it did not. YOUR PRODUCT FAILED OUR FAMILY!!" Aplt. App. v. 9 at 2551-57; Aplt. App. v. 11 at 3252.

- "Child car seat . . . failed to remain in a locked or otherwise secure position while positioned in the car seat's mounting bracket."  The seven month old child was killed.  Aplt. App. v. 9 at 2583-2622; Aplt. App. v. 11 at 3178 and 3252;.

- "Seat detached from the base in the accident. . . . After the accident the child restraint was found upside down behind the driver's seat . . . ."  The four month old child had a "head laceration" that was "leaking spinal fluid."  Aplt. App. v. 10 at 2760-74; Aplt. App. v. 11 at 3099-107 and 3254.

- "The car seat . . . detached from the plastic mounting base secured to the rear passenger seat which caused (the 6 month old infant) to sustain severe blunt head trauma."  The child died.  Aplt. App. v. 10 at 2775-819; Aplt. App. v. 11 at 3254.

- "Carrier detached from base and was ejected out of the vehicle.  Baby was ejected out of carrier and was found in the rear storage compartment of station wagon."  The 18 day old child "sustained severe brain injury" and a "skull fracture" and died.  Aplt. App. v. 10 at 2820-29; Aplt. App. v. 11 at 3254;.

- "On impact (the infant's) car seat came out of the base (and) went across the car into (a second child).  I called Evenflo about the car seat coming

26

out of the base because the possibility for serious injury or babies dying with the car seat coming out of the base seems high . . . people who own this seat need to know."  Aplt. App. v. 10 at 2909-19; Aplt. App. v. 11 at 3256.

On top of this, the jury heard directly from Stephanie Thompson via her videotaped deposition that her child's Discovery had suffered a seat/base separation in an accident.  *See* Aplt. App. v. 7 at 2331-39 and 2340.  Ms. Thompson personally wrote Appellee and talked to a representative on the phone regarding this incident.  Aplt. App. v. 7 at 2333-35.  The letter she sent included the following comments:

> On January 4, 2000, my 7 month old daughter Nina and I were struck in the passenger side of our station wagon by another car . . ..  Nina was buckled into her Discovery car seat behind the driver's seat.  On impact the car seat became dislodged from the base, and Nina (in her seat) was thrown into the rear of the station wagon.  Fortunately, she sustained only minor injuries.
>
> As a safety-conscious mother, I always check that my children are in their car seats with safety belts securely fastened.  I also make sure that the infant seat makes the clicking noise when placed onto the base, telling me that it is (supposedly) properly attached.  You can imagine how shocked I was (and still am!) that my daughter was flung into the rear of the station wagon during the accident.
>
> I am concerned that perhaps the Discovery infant seat . . . may not be as safe as believed.

Aplt. App. v. 9 at 2432-33 (parentheticals in original).

In addition to the mountains of notice to Appellee of the hazards associated with the Discovery's latch, evidence was also admitted that the danger present in the Discovery 316 was not obvious to product users.  Among other things, all three of the Discovery users who testified at trial (Razika, Tony, and Ms. Thompson) made statements that they believed the seat was safe.  Aplt. App. v. 5 at 1382-83 and 1467-68; *see* Aplt. App. v. 7 at 2332-33; Aplt. App. v. 6 at 2332-33.   If nothing else, it would certainly be reasonable for a jury to infer from this evidence that the danger present in using the Discovery 316 with its base was not obvious to product users and that a warning of that danger was, therefore, required.

The evidence also demonstrated that a warning regarding the hazard of seat/base separation was feasible.  After all, the Manual contained numerous other warnings regarding all sorts of other dangers – some even involve the alleged "risk" of eating a lollipop while riding in the car.  Aplt. App. v. 8 at 2342-44.  The warnings contained in the Manual demonstrate that Appellee could have easily included in it a warning advising Discovery users of the high statistical risk of seat/base separations and the *very* high risk of serious injury or death to their children when a separation occurred, and then giving them the choice of assuming these risks in the name of "convenience" or, instead, simply choosing to use the seat without the base to avoid this danger.  Of course, Appellee actually did issue

warnings with respect to the separation hazard in the Discovery model 390/391 – clearly to do so with respect to the Model 316 was just as feasible.

Overall, the evidence of the numerous Discovery seat/base separations that occurred prior to June 10, 2005 was enough to convince the District Court that, at the time of the accident, that there was sufficient evidence for the jury to find that Appellee was "omitting a *by then <u>fairly well-established history of detachments</u> in similar car seats, substantially similar car seats, substantially similar situation and accidents . . . .*"  Aplt. App. v. 5 at 1484 (emphasis added).  And, based on this "well-established history," a reasonable jury could certainly find that Appellee knew or had reason to know of the danger present in the Discovery 316 and that it had the ability to provide such a warning in the Manual for the Discovery 316.

E.  Appellee's Failure to Warn Created A Jury Question On Whether The
<u>Discovery Seat Was Defective and Unreasonably Dangerous</u>

The evidence admitted at trial was uncontroverted that Appellee did not warn of the danger of the seat/base separation.  Both Razika and Tony testified that they had no knowledge of this danger after reading the Manual and, thus, were not warned by Appellee regarding it.   Aplt. App. v. 5 at 1384-85 and 1458. The Manual that came with A.H.'s seat contained nothing pertinent to the seat/base separation danger present in it.  Aplt. App. v. 3 at 725-26; Aplt. App. v. 7 at 2341-55.   Therefore, there was sufficient, if not uncontroverted, evidence for a

reasonable jury to determine that Appellee did not warn of the danger of seat/base separations present in the Discovery 316.

As seen above, a mountain of evidence was also presented regarding the likelihood of a latch failure and the seriousness of the consequences of this failure. "The requirement for a warning . . . is determined by taking into consideration the likelihood of accident and the seriousness of the consequences of a failure to warn." *Downing*, 707 P.2d. at 1033.   In this regard, Appellee's own records indisputably proved that the Discovery's latch was failing in one out of ten reported accidents and that, in those accidents, over a third of all infants were suffering head injuries – or death – when these failures occurred. *See* Aplt. App. v. 11 at 3246-60.  What could possibly be more suitable for a failure to warn claim than these kinds of statistics?   At a minimum, this evidence was more than sufficient for a reasonable jury to determine that Appellee was required to warn Discovery users, including Appellants, of the danger of latch failures and seat/base separations and to let them decide whether to accept that risk for a little "convenience."

## F.  <u>A.H.'s Injury Resulted From Appellee's Failure To Warn</u>

Both Razika and Tony Hadjih testified that if they had been warned about the danger of the Discovery seat separating from its base, they would have either not used the seat at all or, at the very least, not used it with its base.  Aplt. App. v. 5

at 1384-85 and 1471.  Furthermore, the evidence was uncontroverted that the base

of A.H.'s Discovery remained tightly attached to the Jeep's seat in the crash; only

the infant seat, with A.H. tightly secured inside, was thrown into the back of the

Jeep.  Aplt. App. v. 5 at 1387-88.  In addition, both of Appellants' experts clearly

testified that it was the latch failure, the danger which Appellee failed to warn the

Hadjihs about, that caused A.H.'s injuries.  Aplt. App. v. 2 at 578; Aplt. App. v. 3

at 912.

In their response to Appellants' Motion for New Trial, Appellee took issue

with this evidence asserting that it was insufficient to demonstrate that "the lack of

the warning caused the accident."   Aplt. App. v. 1 at 213 (quoting *Staley v.

Bridgestone/Firestone, Inc.*, 106 F.3d 1504, 1508-09 (10th Cir. 1997)).[5]

Specifically Appellee alleged that "a plaintiff must show that a 'warning . . . if

followed would make the product safe for users.'"  Aplt. App. v. 1 at 213. (quoting

*Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1114 (D. Colo. 2000)).  In

making this argument, Appellee labors under the false impression that a plaintiff

has the burden of demonstrating what warning should have been given to prevent

the seat/base separation of A.H.'s Discovery.  This is simply not true; the fact that

"no instructions or warnings of any kind" were provided by Appellee regarding a

---

[5] Appellants believe that Appellee was attempting to cite this case in its Opposition to
Appellants' Motion for New Trial but only cited it as *id.* without a full citation.  *See* Aplt.
App. v. 1 at 213 (citing *Id.* At (sic) 1508-09).

known danger creates "a factual basis for submitting the case to the jury under a failure to warn theory." *See Martinez v. Atlas Bolt & Screw Co.*, 636 P.2d 1287, 1290 (Colo. App. 1981).

Furthermore, the facts in both *Staley* and *Bartholic* are readily distinguishable from the facts in the current case. In both cases, a warning would not have made any difference because there was undisputed evidence that the plaintiffs or the decedent <u>knew</u> of the danger. *See Staley*, 106 F.3d at 1509 ("the evidence was unrefuted that [the decedent had been] instructed [prior to the accident] in the OSHA-prescribed regulations, . . . [had] certified that he knew them, . . . [and] had been extensively trained [regarding the product]" and, thus, had knowledge of the very hazard that caused his death); *see also Bartholic*, 140 F. Supp. 2d at 1114-15 (plaintiffs failed to offer "any evidence that would suggest a substantial likelihood that these proffered warnings would have prevented" the accident in question based on the fact that plaintiffs conceded that they already knew "a butane lighter is dangerous in the hands of a child" and, therefore, any additional warnings would not have prevented the lighter in question from ending up in their child's hands).

These facts are markedly different from the facts in this case where there is not one shred of evidence that Tony or Razika knew of the Discovery's propensity to separate from its base. Indeed, there was substantial and <u>*uncontroverted*</u>

evidence to the contrary. Therefore, the evidence presented here was sufficient for a reasonable jury to conclude that Appellee's breach of its duty to warn caused A.H. to suffer his traumatic brain injury on June 10, 2005.

### G. The Court Failed To Recognize That A Manufacturer Can Be Liable For Failing To Warn Of Dangers Present In A Product's Proper Use

What the District Court's decision ignores is that a manufacturer can be held liable if it fails to warn of a danger that is inherent in the proper use of a product if that danger is not generally known to the public. A classic example of this is set forth in the RESTATEMENT (SECOND) OF TORTS § 402A, which Colorado has explicitly adopted. *See Hidalgo v. Fagen, Inc.* 206 F.3d 1013, 1017 (10th Cir. 2000). The example given describes a product that contains an ingredient to

> which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger.

RESTATEMENT (SECOND) OF TORTS, § 402A cmt. j. This same logic also applies to other products such as prescription drugs i.e. products that might serve a beneficial purpose to the user but also subject their user (or in the case of the Discovery, the user's child) to a risk known to the manufacturer but unknown to the user. *Id.*

Such warnings allow the user to make an informed decision as to whether to use the product for his benefit while assuming the risks described in the warnings

or to not use the product at all – or, in the case of the Discovery, use it in a way that completely eliminates the risk in return for giving up some minor "convenience." In such cases, "whether or not it is reasonable to market and sell [a product to users] without warning of the dangers inherent in [it] is . . . a factual determination to be resolved by the jury." *Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 203 (Colo. 1992) (en banc).

### H. The District Court Committed Reversible Error By Taking Appellants' Failure to Warn Claim from the Jury

"[A] trial judge should only invade the fact-finding function of the jury in the clearest cases when the facts are not in dispute." *Union Supply Co*, 583 P.2d at 279. Here, however, the District Court chose to do just that because it believed that the case was a "design case" and it did not "make any sense for [Evenflo] to warn people that they had better use a single base for their configuration. That goes against the very nature of what was being sold, and that isn't what failure-to-warn cases are about." Aplt. App. v. 5 at 1481. The Court declined to expand upon its basis for this ruling in its Order denying Appellants' Motion for New Trial. Aplt. App. v. 1 at 233.

In making its decision to take the warning claim from the jury, the District Court "did *not* rule that [Appellants'] evidence had been insufficient to support the stricken [failure to warn] claim, the sole basis on which Fed. R. Civ. P. 50(a)(1) authorizes trial judges to grant such motions." *Beene v. Ford Motor Co.*, 513 F.

34

App'x 755, 758 (10th Cir. 2013) (emphasis in original). Instead, the Court apparently, and implicitly, found that Appellants' warnings claim was subsumed by the defective design claim, a proposition which this Court recently noted is unsupported by any authority. *See id.*

As explained *supra*, a failure to warn claim is an entirely separate claim from a design defect claim in that a product free of a design defect can still "be defective and unreasonably dangerous if not accompanied by adequate instructions and warnings." *Anderson,* 604 P.2d at 676; *see also Vista Resorts, Inc.*, 117 P.3d at 71. It is also an entirely separate claim from a CCPA claim because a CCPA claim requires a showing that the defendant's deceptive trade practice "significantly impact[ed] the public as actual or potential consumers of the defendant's goods." *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120 (10th Cir. 2008). No showing of public impact is required in a failure to warn claim.

## I. Conclusion

Because a factual basis existed for submitting Appellants' warning claim to the jury, "the trial court's refusal to do so was error." *Downing*, 707 P.2d at 1034; *see also Bailey v. Montgomery Ward & Co.,* 690 P.2d 1280, 1282 (Colo. App. 1984). More specifically, since "there was a factual basis for submitting the case to the jury under a failure to warn theory, . . . the trial court should have instructed

35

the jury on that theory." *Martinez*, 636 P.2d at 1290.  And its "failure to do so constitutes reversible error." *Id.*  This Court should reverse and remand for a new trial on the merits of that claim.

> **2. THE DISTRICT COURT ERRED WHEN IT (I) ADMITTED THE DEPOSITION OF A WITNESS WHEN "UNAVAILABILITY" HAD NOT BEEN DETERMINED UNDER FED. R. CIV. P. 32(A)(4)(B), AND (II) RELIED ON AN IMPROPER INTERPRETATION OF THIS RULE TO FIND, IN ITS ORDER DENYING APPELLANTS' MOTION FOR NEW TRIAL, THAT ITS ADMISSION OF THE DEPOSITION TESTIMONY AT TRIAL WAS NEITHER ERRONEOUS NOR UNFAIRLY PREJUDICIAL TO APPELLANTS**

A. <u>Standard of Review</u>

This Court reviews the District Court's decision *allowing* the deposition testimony of an "unavailable witness" for abuse of discretion; the District Court's *interpretation* of the federal rules is examined *de novo*.  *Garcia-Martinez v. City and County of Denver*, 392 F.3d 1187, 1190 (10th Cir. 2004).  In performing this review, this Court examines all factual findings of the District Court "under the clearly erroneous standard, and while [giving] due deference to the [D]istrict [C]ourt's application of the guidelines to the facts, when that application involves contested issues of law," this Court reviews the lower court's conclusions as to those issues *de novo*.  *United States v. Medina-Estrada*, 81 F.3d 981, 986 (10th Cir. 1996).

Applied here, these standards require this Court to review the District Court's application of Fed. R. Civ. P. 32(a)(4) to the facts before it "fully for errors of law." *United States v. Smith*, 888 F.2d 720, 723 (10th Cir. 1989). And if this Court finds an error of law by the lower court, and if that error was prejudicial to Appellants, it must reverse and remand this matter for a new trial. *See S.E.C. v. Peters*, 978 F.2d 1162, 1164 (10th Cir. 1992).

### B. Randy Kiser Was A Critical, Pivotal Witness

Randy Kiser was, for many years, the Director of Product Safety, Research and Development for Appellee. He regularly testified on Appellee's behalf in product liability cases, both in deposition and trial. He submitted several affidavits to the District Court in this case during a lengthy discovery dispute (his testimony was rejected by both the magistrate and the trial judge) and was produced for deposition as a corporate representative. He was the most knowledgeable employee of Appellee on issues related to the latch failures and seat/base separation issues with the Discovery, and was identified by Appellee to offer "fact" testimony, and a considerable amount of expert testimony, on Appellee's behalf. Aplt. App. v. 1 at 185-90. As the court found, Appellee "obviously" believed Kiser was a "key witness" in the case. Aplt. App. v. 1. at 234-35.

Kiser was not just knowledgeable in terms of the design and labeling issues. He *personally* reviewed the vast majority of the 74 latch failure complaints

reported to the company and wrote summaries of each complaint on its behalf. Many of the Discovery seats subject to these consumer complaints were returned to Evenflo for "engineering inspections"; of the 36 seats returned, Kiser was the designated engineer who _personally_ inspected at least 18 of those seats, after which he prepared written conclusions regarding his inspections. Aplt. App. v. 11 at 3246-60.  He was, in sum, the principal source of all knowledge at Evenflo regarding the seat/latch failures in the Discovery.

Kiser personally inspected the seat in which A.H. was seated at the time of the accident, as well as the Hadjih's Jeep and seat belts. He was the company's liaison with the NHTSA during the federal investigation into the latch failures in the Discovery and signed letters to NHTSA.  Aplt. App. at v. 7 at 2204-11.  He was instrumental in the decision to recall the Discovery Model 390/391 for seat/base separation hazards.  Aplt. App. v. 1 at 235.  Given his background, as well as his years of testifying for Appellee, Appellants were very much looking forward to his cross-examination in the presence of the jury.  But it was not to be.[6]

---

[6] Appellants see no need in restating all of the facts underlying Kiser's absence from trial and the scheme that was "orchestrated" by Appellee's counsel to avoid what would have been devastating cross-examination.  Instead, Appellants refer this Court to the factual findings on Appellee's efforts in this regard – none of which were appealed by Appellee. Aplt. App. v. 1 at 233-53.  Appellants also urge this Court to examine the briefing filed in support of and in opposition to the Motion for New Trial to put the District Court's fact finding in context.  The Court's findings of fact regarding the conduct of Appellee's counsel, particularly when understood in full context, are both unsettling and troubling.

### C.  The District Court Erred In Allowing The Kiser Deposition To Be Played At Trial

"Deposition testimony is normally inadmissible hearsay, but Fed. R. Civ. P. 32(a) creates an exception to the hearsay rule." *Angelo v. Armstrong World Indus.*, 11 F.3d 957, 962-63 (10th Cir. 1993).  The Rule, however, "does not change the judicial preference for direct and cross-examination of a witness at trial." *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on November 15, 1987*, 720 F. Supp. 1493, 1501 (D. Colo. 1989).  Thus, the burden of proving that a deposition is admissible is on the party offering the deposition. *Angelo*, 11 F.3d at 962.

To meet this burden under Rule 32(a)(4), the proponent of the deposition testimony must demonstrate that the witness in question is "unavailable" by showing:

(A) that the witness is dead;

(B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition;

(C) that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment;

(D) that the party offering the deposition could not procure the witness's attendance by subpoena; or

(E) on motion and notice, that exceptional circumstances make it desirable – in the interest of justice and with due regard to the importance of live testimony in open court – to permit the deposition to be used.

Fed. R. Civ. P. 32(a)(4)(A)-(E).  In this case, Appellee offered Kiser's testimony upon the representation that he was unavailable based on him being "more than 100 miles from the place of hearing or trial."  But the "mere fact a [deponent] is more than 100 miles from the courthouse does not require the district court to automatically admit [his or her] deposition."  *Garcia-Martinez*, 392 F.3d at 1191 (citing *Polys v. Trans-Colorado Airlines, Inc.*, 941 F.2d 1404, 1410 (10th Cir. 1991)).  Instead, and based on the plain language of Rule 32(a)(4)(B), Appellee had to show that Mr. Kiser was more than 100 miles away from the courthouse without it appearing as if his absence had been procured by Appellee.

<u>The District Court Erred In Admitting Kiser's Deposition</u>

The District Court's admission of the deposition of a witness more than 100 miles from the courthouse is proper unless it "appears" that the witness's absence was procured by the offering party.  *See* Fed. R. Civ. P. 32(a)(4)(B); *see also Alfonso v. Lund*, 783 F.2d 958, 961 (10th Cir. 1986) ("Under Rule 32(a), admission . . . was proper if [deponent] was out of the country, unless his absence was procured by the [offering party].").  Thus, where a party makes "'scant effort" for a witness to appear for trial, a finding that that witness's absence was procured by the party is proper.  *See Garcia-Martinez*, 392 F.3d at 1192.

40

It is clear from the record made during trial that the District Court had serious doubts about Appellee's claim that Kiser was unavailable for trial due to Appellee's alleged lack of "control."  Although the Court was in the dark about the true facts at the time,[7] the Court questioned lead counsel for Appellee about his ability to get Kiser to trial and expressly prefaced his question with a rather unique statement to a lawyer practicing before it: "I want an honest, candid answer."  Aplt. App. v. 5 at 1485.  Lawyers are required to be "honest" and "candid" with every judge, so this statement reveals, on its face, considerable concern about the credibility of Appellee's counsel with respect to Kiser's availability.[8]

The question came next: "[C]an you get him (Kiser) here; is this tactical?"  Aplt. App. v. 5 at 1485.  The response from Appellee's lead counsel, which was later found *as fact* to have been neither honest nor candid, was as follows:

> It is not tactical, Your honor.  . . .  He doesn't work for us, we asked him could he put one day aside, can we do it Tuesday.  He doesn't work for me. . . . I don't control him.

Aplt. App. v. 5 at 1485-86.  The Court followed up: "Can you get him here?"  Aplt. App. v. 5 at 1485.  Of significance to the issue before this Court, Appellee's counsel answered "*I can ask him if I can get him here Thursday or Friday*.  I don't

---

[7]  As the District Court later determined in its own ruling on the Motion for New Trial.  *See* Aplt. App. v. 1 at 233-53.

[8]  Appellants note that Appellee's long time employee and General Counsel (William Gross) was present throughout trial and never once stepped in to correct or clarify any statement made by his lead counsel to the trial court.  The company's national trial counsel (Molly Jones) was also present.

control him.  *I can tell you tomorrow, but I have the video ready to go*."  Aplt. App. v. 5 at 1485-86.  At that point, counsel for Appellants again objected to admission of the testimony under Rule 32 with specific focus on the "absence has been procured" language.  Aplt. App. v. 5 at 1486-89.

The District Court, still clearly concerned, then asked for Kiser's telephone number; after some professed difficulties finding the number, Appellee finally came up with a work number and the courtroom deputy dialed the number.  Aplt. App. v. 5 at 1489-91.  The call went to voice-mail.  Aplt. App. v. 5 at 1491.  Later in the day, and despite concerns by the Court about Appellee's alleged inability to procure Kiser as a "live" witness – not to mention counsel for Appellee's statement that he would not have an answer regarding availability until *the next day* – Appellants' Rule 32 objection was overruled and Appellee was allowed to play the deposition to the jury.  Aplt. App. v. 5 at 1554.

The record thus establishes that: (1) the District Court had real concerns about Appellee's involvement in Kiser's alleged inability to appear for trial; (2) Appellee's counsel claimed not to know whether he could or could not get Kiser to Denver for "live" testimony; and (3) Appellee's counsel told the Court he would have an answer regarding Kiser's availability *the next day*.  Despite the Court's concerns and clear lack of information, the Court inexplicably allowed Appellee to

begin playing the deposition in the presence of the jury.  Aplt. App. v. 5 at 1554. This was an abuse of discretion and error.

It was an abuse of discretion because the District Court admittedly *did not know* if Kiser was truly an "unavailable witness" under Rule 32(a)(4) when it ordered the playing of the deposition to begin.  Because the Court did not know the answer to the "availability" question, one way or the other, the Court could not possibly have determined that Kiser's absence had not been procured by Appellee as required by Rule 32(a)(4)(B).  In fact, the Court's repeated inquiries as to Kiser's availability clearly demonstrate that, at the very least, it appeared to the Court that Kiser's absence might have been procured.

Moreover, and in interpreting Rule 32, other courts have found that the party offering the deposition of an "unavailable" witness has the burden of demonstrating he or she did not procure the absence of that witness.  *See, e.g., Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 995 (1st Cir. 1992).  In *Fairfield*, the First Circuit affirmed the refusal to admit a deposition pursuant to Rule 32(a)(4) in part on a finding that the offering party failed to present "[any] reason why [its witness] shouldn't be there."  *Id.*  As stated by that Court, it was proper to exclude the deposition "[a]bsent any indication in the record that [the witness's] alleged inability to attend trial was substantiated."  *Id.*

43

The current case goes well beyond Appellee being unable to substantiate that Kiser could not make trial – at the time the court ordered Appellee to "start" playing the deposition, the District Court did not know if Kiser was actually available or not. Therefore, the sole justification for the ruling was the fact that Kiser was not within 100 miles of the courthouse. But this justification alone is not enough. *See* Fed. R. Evid. 32 (a)(4)(B); *see also Air Crash Disaster*, 720 F. Supp. at 1502.

In *Air Crash Disaster*, the offering party's "sole basis for their assertion of unavailability was that [the witness] lived outside the 100 mile radius." *Id*. The court rejected this, finding that "the ability of the jury to personally consider and evaluate the witness's credibility was a paramount concern." *Id.* It further noted that "[m]ere inconvenience to the witness does not outweigh the substantial need to evaluate the demeanor of a witness presenting controversial testimony . . . ." *Id.*

Nowhere is this more clearly set forth than in *Stoczynski v. Livermore, D.C.*, a Colorado Court of Appeals opinion with facts eerily similar to the ones before this Court. *See* 782 P.2d 834 (Colo. App. 1989). In *Stoczynski*, a party listed an expert on its witness list "as an anticipated live witness and submitted no supplemental certificate to indicate that the deposition would be substituted." *Id*. at 835. The party continued this façade until trial when it suddenly made its decision to not call the expert witness. *Id.* As here, the court found that "the

decision not to call the expert was of a purely tactical nature." *Id.*  Based on these facts and its application of C.R.C.P. 32(a)(3)(B), Colorado's almost identical counterpart to Fed. R. Civ. P. 32(a)(4)(B), the court affirmed the exclusion of the deposition because of the offering party's failure to comply with the statute.  *Id.*

The District Court here was faced with a straightforward problem – the admissibility of a deposition under Rule 32.  The Court was concerned about the foundation for the rule – whether the witness was truly unavailable despite factors that made it appear that his absence was procured – and asked valid questions to Appellee's counsel on that issue.   The Court then admitted, without learning the answers to its own questions, Kiser's deposition testimony and allowed it to be played to the jury.  The Court's error in this regard was compounded when, after trial, it learned that in fact Appellee's counsel had made misrepresentations about Kiser's availability and nonetheless determined that Rule 32's requirements had still been met.

The Court Erred in Upholding its Admission of Kiser's Deposition<br>In Its Ruling On Appellants' Motion For New Trial

The District Court incorrectly applied Fed. R. Civ. P. 32(a)(4)(B) to the facts as found in its Order denying Appellants' Motion for New Trial.  With respect to these facts, the Court made two conclusions based on its interpretation of Rule 32 that Appellants challenge.  First, that "permitting the deposition [of Kiser] to be

played by Appellee was [not] erroneous" and, second, that Appellee's "use of this decision [did not] deprive[] the [Appellants] of a fair trial." Aplt. App. v. 1 at 252.

A review of the Order establishes that the District Court indisputably found that Appellee *could have produced* Kiser "live" at trial if it had wanted to. It found as *fact* that Kiser "remained willing to cooperate with Evenflo and its counsel in the present case" – meaning that if Appellee simply would have asked Kiser to come, he would have come. Aplt. App. v. 1 at 245. In fact, the Court found Appellee's assertion that "Mr. Kiser would have refused to change his plans and travel to Denver, even at the 'last minute,' had Evenflo informed him the company truly needed his live testimony" unbelievable. Aplt. App. v. 1 at 245-46. There is simply no question that Appellee had, at all times and as was true with its several other out of state expert witnesses, the unfettered ability to produce Kiser as a "live" witness at trial. Aplt. App. v. 1 at 249.

However, Fed. R. Civ. P. 32(a)(4)(B) requires exclusion of a deposition on a showing only that it "*appears*" the witness's unavailability has been procured by the offering party. Here, and because the District Court found as *fact* that Appellee could have made Kiser available at any time, the Court's ruling affirming the admission of the deposition in the Order denying the new trial is completely contrary to this Rule. The Court's ruling was in error, was based on a misinterpretation of the Rule, and should be reversed.

The issue here, however, is aggravated by the conduct of Appellee and its counsel, again, as set forth in facts found by the District Court that were not appealed by Appellee.  Instead of providing the Court with information the Court deemed necessary to resolve the Rule 32(a)(4) problem in an "honest" and "candid" manner, Appellee's lead counsel, in the presence of its General Counsel and national trial counsel, chose to execute a strategic plan to protect Kiser from cross-examination after repeatedly representing to both the Court and Appellants that Appellee would be bringing him to testify "live."  As the Court found, "the scenario as it played out from Mr. Kiser's departure to the conclusion of trial was substantially driven by strategic and tactical considerations."  Aplt. App. v. 1 at 246.

Appellee orchestrated its plan perfectly and, with the exception of an affidavit filed shortly before trial as an exhibit to a reply brief, "gave off no other indication that it was seriously thinking of not calling Mr. Kiser until sometime during the first week of trial, probably not before Friday."  Aplt. App. v. 1 at 246. The District Court further determined that, while Appellee may have "'conclusively' decided not to call Mr. Kiser as a live witness on Saturday," this was the culmination of a strategic plan that Appellee had put into action months earlier.  Aplt. App. v. 1 at 246.

Based on the District Court's own determination of the facts as set forth in its Order on the Motion for New Trial, it should have interpreted Rule 32(a)(4)(B) to find that the admission of the deposition was error. Yet, it failed to do so and, instead, upheld the admission of Kiser's deposition based on nothing more than the fact that he was not within 100 miles of the courthouse.

Since the District Court was convinced that Appellee's only justification for producing Mr. Kiser via deposition was false, there was no basis for the Court to find that Appellee satisfied its burden of proving that the hearsay exception set forth in Fed. R. Civ. P. 32(a)(4)(B) applied. *See Angelo*, 11 F.3d at 962; *see also Jauch v. Corley*, 830 F.2d 47, 50 (5th Cir. 1987). Therefore, the admission of the deposition was erroneous because it is abundantly clear that Appellee made scant effort – none, actually – to present Kiser "live." *See Garcia-Martinez*, 392 F.3d at 1192.

### D.  The Court's Error Was Prejudicial

The District Court erred in determining that the use of Kiser's deposition did not deprive Appellants of their right to a fair trial.

### The Historical Preference for Live Testimony

The restrictions set forth in Fed. R. Civ. P. 32 on the use of depositions at trial clearly demonstrate that:

> the long-established principle that testimony by deposition is less desirable than oral testimony and should ordinarily be used as a

> substitute only if the witness be unavailable to testify in person.  Or,
> as was stated by Judge Learned Hand, . . . "[t]he deposition has
> always been, and still is treated as a substitute, a second-best, not to be
> used when the original is at hand."

*Salsman v. Witt*, 466 F.2d 76, 79 (10th Cir. 1972).  Thus, Rule 32 itself represents

the undisputable "importance of presenting the testimony of witnesses orally in

open court."  *Id.*  Nowhere is this more important than with a key witness like

Kiser, an expert witness and safety engineer, whom was deposed without having

produced a report given his then status as an "employee" of Appellee and who had

extensive personal knowledge of facts relevant to the questions the jury was being

asked to decide.

This preference for "live" testimony is often at the expense of convenience,

which is outweighed by "the unfairness of limiting an opponent's right to

demonstrate varying interpretations of the facts on which the witness bases his

testimony."  *Air Crash Disaster*, 720 F. Supp. at 1502.  Further, presenting the

witness live meets the jury's need to "consider and evaluate the witness's

credibility."  *Id.*  These "[c]onsiderations of fairness are particularly important

when the offering party fails to met (*sic*) [its] burden of establishing that the

deposition is admissible."  *Id.* In fact, depending on the importance of the evidence

offered through the deposition, the improper admission of deposition testimony can

be highly prejudicial to the opposing party.  *Jauch*, 830 F.2d at 50.

## The Historical Condemnation of Surprise Tactics

Historically, numerous courts have also spoken out against a party and its counsel strategically and deliberately misleading the opposing party to gain an advantage at trial.  As noted by Justice Brennan: "[t]he technique of playing the cards close to the vest and hoping by surprise or maneuver at the trial to carry the day, whether or not right and justice lies on the side of one's client, won't be tolerated."  Closer to home, this Court has recognized that surprise to opposing counsel is an appropriate consideration in determining whether a trial court properly admitted a deposition pursuant to Fed. R. Civ. P. 32(a).  *Polys*, 941 F.2d at 1410.  In fact, surprise is of such concern to this Court that it alone can warrant a new trial.  *See Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1411 (10th Cir. 1988). But Appellants do not stand on that solitary ground in the current case.

## Prejudice

Appellee's deception and misrepresentations, which were plainly deliberate and are now essentially admitted by Appellee, coupled with the court's erroneous admission of Kiser's deposition, represents the rare intersection of these two long-recognized pillars in our justice system.  The plan orchestrated by Appellee allowed it to present the important testimony of Kiser in a way that eliminated the risk of a damaging cross-examination by surprising opposing counsel.

The importance of Kiser's testimony to Appellee's defense of the Discovery simply cannot be overstated. Prior to trial, the Court ruled that the recall of the Discovery 390/391 could come into evidence because of substantial similarities between the seat/base latch in the 390/391 and the one in the Discovery used by A.H. Aplt. App. v. 1 at 101-07. The evidence of this recall presented at trial certainly left a crucial question in the minds of the jury: how could Appellee recall the Discovery 390/391 because of its propensity to suffer from seat/base separation but then, with a straight face, argue that A.H.'s Discovery was not defective for the same reason?

Kiser provided the answer. His deposition testimony included questions about the 2004 NHTSA investigation of the Discovery 316 and how the investigation was closed without a recall being ordered. Aplt. App. at v. 7 at 2204-11 and 2260-64. Testimony on this and other related issues was sought from Kiser by Appellants during the discovery process, seeking facts and information otherwise unavailable to Appellants from a witness who had been designated as a corporate representative and an expert – who had never even filed a report because of his (then) status as an employee of Appellee. There was simply no cross-examination developed at the time of the deposition on this issue, nor could there have been. Given free rein to put in this theory without any fear of cross, Appellee was able to develop its defense that, by closing the investigation, NHTSA had

blessed the seat's design despite the latch failures.  Aplt. App. v. 6 at 2032-33.

Through this testimony and only this testimony, Appellee was able to convince the

jury that, because the Discovery 316 was good enough to have survived the 2004

NHTSA investigation without a mandatory recall, it should also be good enough

for them.  App. v. 6 at 2032-33.

Appellee's tactics allowed them to present this testimony without any cross-

examination about the specific details of the 2004 NHTSA investigation.  This

cross-examinationwould have included questioning about several letters that Kiser

sent to NHTSA on Evenflo's behalf that were full of incomplete, misleading and

outright false information – all of which NHTSA relied on when it closed its

investigation of the Discovery 316.  This cross-examination would have painted a

complete picture of the NHTSA investigation to the jury and allowed it to make its

own determination regarding whether A.H.'s Discovery was defective and whether

NHTSA had really "blessed" the design.

The reason that this cross-examination was not heard by the jury was no

accident.  Instead, it was the result of Appellee's counsel setting a bear trap months

in advance of trial to ensnare Appellants.  As the District Court found, this

"scenario was orchestrated" by Appellee's repeatedly not being "forthright about

Mr. Kiser's change of employment" and "in at least one respect" not being

forthright with the Court.  Aplt. App. v. 1 at 250.  Further, "[t]he continuum of

[Appellee's] conduct maintained in the minds of [Appellants'] lawyers the anticipation that Mr. Kiser would testify at trial." Aplt. App. v. 1 at 250. Through this "gamesmanship," Appellee hid the truth from both Appellants and the court "that it was at least considering the use of [Mr. Kiser's] deposition instead of live testimony all along." Aplt. App. v. 1 at 250. By doing so, Appellee's counsel was able to do what it was seeking to accomplish all along – create undue prejudice against Appellants that would result in a victory for Appellee.

## E.    Conclusion

This case presents a unique combination of circumstances surrounding the admission of Kiser's deposition in lieu of his live testimony. The District Court clearly found the only basis that Appellee offered at trial to demonstrate Kiser's absence was not procured by it to be untrue. Equally clear is that the Court found that Appellee effectively used deception to ambush the Appellants at trial and to gain an advantage through the deception. That advantage was then utilized at trial to play the deposition from Appellee's most important witness without the witness's testimony being subjected to the rigors of cross-examination.

The District Court also misapplied Fed. R. Civ. P. 32(a)(4)(B) to the facts as it found them. Because, in the face of Appellants' accusations that Kiser's absence was procured by it, Appellee offered no valid explanation to the contrary, it failed to meet its burden of demonstrating unavailability. *See Angelo*, 11 F.3d at 963.

Since the requirements of Fed. R. Civ. P. 32(a)(4)(B) were not met, it was error for the Court to have received Kiser's deposition into evidence.  *See Salsman*, 466 F.2d at 79.  Since the deposition was highly prejudicial to Appellants, "the trial court's admission of the deposition in violation of Rule 32(a) . . . constituted reversible error."  *Jauch*, 830 F.2d at 50.  Therefore, Appellants pray that this Court reverse and remand this matter on these grounds for a new trial on all issues.

### VII.   STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Because this case presents a unique combination of circumstances surrounding the admission of Kiser's deposition in lieu of his live testimony that raises what could be deemed novel issues, counsel submits that oral argument would be helpful to this Court.

### VIII.  CONCLUSION

The District Court's entry of a directed verdict on Appellants' failure to warn claim should be reversed and that claim remanded to the District Court for a new trial on that claim.  In addition, the District Court's judgment for Appellee on all of Appellants' other claims should be reversed and remanded for a new trial on those claims as well.

Respectfully submitted,

DOUTHIT FRETS ROUSE GENTILE
   & RHODES, LLC

/s/ R. Douglas Gentile
Evan A. Douthit
R. Douglas Gentile
5250 W. 116th Place, Suite 400
Leawood, Kansas 66211
(913) 387-1600
(913) 928-6739 – fax
edouthit@dfrglaw.com
dgentile@dfrglaw.com

COPPOLA & MARLIN, P.C.
William C. Marlin
3010 E. 6th Avenue
Denver, Colorado 80206
(303) 573-7777
(303) 825-3950 – fax
Bill@CoppolaMarlin.com

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains **13,396** words.

Complete one of the following:

__X___       I relied on my word processor to obtain the count and it is Word Version # 7; or

_____       I counted five characters per word, counting all characters including citations and numerals.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

By:    /s/ R. Douglas Gentile_____
Counsel for Appellants

56

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing APPELLANT'S OPENING BRIEF, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with VIPRE Business GFI Software version 6.2.5530.0, Virus Definition File Dated: 12/29/2013, and according to the program, is free of viruses.  In addition, I certify all required privacy redactions have been made.

By:     /s/ Jeanie L. Mason
        Paralegal

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing APPELLANTS' OPENING BRIEF was furnished through (ECF) electronic service to the following on this 30th day of December, 2013.

Michiko Brown
John M. Fitzpatrick
Erin F. Frohardt
Wheeler Trigg Kennedy LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5647

Dan H. Ball
Molly Jones
Bryan Cave, LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102


/s/ Jeanie L. Mason
Paralegal